******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

APPENDIX

ANDREA MICEK-HOLT, EXECUTRIX (ESTATE
OF EDWARD F. MICEK) *v.* MARY
PAPAGEORGE ET AL.*

MARY PAPAGEORGE *v.* ANDREA
MICEK-HOLT ET AL.

Superior Court, Judicial District of Windham at Putnam

File Nos. CV-14-6008881-S and CV-15-5006173-S

Memorandum filed September 26, 2016

*Proceedings*

Memorandum of decision in actions for, inter alia, breach of contract. *Judgments for the plaintiff in the first case and for the named defendant et al. in the second case.*

*Mathew Olkin,* for the defendants in the first case, plaintiff in the second case.

*Beth A. Steele,* for the plaintiff in the first case, named defendant et al. in the second case.

*Opinion*

BOLAND, J. Over a period of two days, this court tried these two matters, which involve conflicting claims of the same parties. These pending suits are actually numbers three and four between them, having been preceded by a 2011 summary process action in the Superior Court, geographical area number eleven, captioned, "Edward Micek *v.* George Papageorge," Docket No. 11-8151. That case went to judgment, the terms of which have a bearing upon the matters before me, as will be discussed below. Edward Micek filed a later action of the same nature in the same venue, and with the same caption, bearing Docket No. 11-9324, but he died during its pendency and it was dismissed for inactivity. Given the lengthy and increasingly acrimonious tone of this dispute, it is the intent of this jurist that this decision resolve all the issues outstanding between these parties so as to obviate the need for any later lawsuits.

I

INTRODUCTION

At the heart of the parties' dispute is a single-family home located at 361 Thompson Road in the town of Thompson. The home was built almost two hundred years ago, but photographs submitted depict it as a stately residence in overall good condition. At all relevant times until his death in 2014, Edward Micek was the land-record owner of the home. Andrea Micek-Holt is his daughter and the executrix of his estate. The decedent resided at 366 Thompson Road, immediately across the street from number 361. His daughter resides there today.

At some point in 2010, the decedent decided to sell number 361. He was acquainted with Mary Papageorge and George Papageorge, a married couple, as they owned a business which supplied his premises with heating oil. The deal which ensued from their negotiations provided that the Papageorges would take occupancy under a lease from August of 2010 through August 31, 2011. At the same time, they entered into a contract of purchase and sale. Only Ms. Papageorge was named as a buyer. That contract provided for a closing at the end of the lease term. The lease specifically incorporates the provisions of that contract, even though, oddly, certain of their provisions are contradictory.

In addition to Mary and George, two of their children also occupied the home. One of them, Angelina, is now an adult and remains a resident. Named as a defendant in the 2014 case, she has appeared but has not asserted any separate defenses on her own behalf. She has joined her parents as a counterclaim plaintiff on two of their counts. She did not attend the trial. The orders which are set forth below are applicable to her to the same extent as to her parents.

Under the lease, the actual lessee was Kalami Corporation, an entity named as an additional defendant in the 2014 case. Ms. Papageorge testified that the corporation was owned by her family and engaged in real estate holdings. The corporation was a party only to the lease, and not to the sales agreement. Like Angelina, the corporation has appeared and has not asserted any separate defenses on its own behalf. Also, it has not asserted any additional claims on its behalf.

The difficulties outlined below commenced in mid-August of 2011, a few weeks preceding the anticipated closing date.

## A

### Micek-Holt Claims

Alleging that by means of a variety of ruses and subterfuges the Papageorges have frustrated every reasonable effort to complete the title conveyance and pay the agreed upon consideration, Ms. Micek-Holt sues on behalf of the estate in seven counts. These include claims for (1) breach of contract; (2) unjust enrichment; (4) to quiet title; (5) to foreclose defendants' equitable claims to the property; (6) to specifically enforce the terms of the 2010 contract; and (7) to evict them. Her third count seeks a declaratory judgment in terms generally tracking the material in the other six counts.

The Papageorges deny all material allegations of each count. They also plead seven separate special defenses. Two of these can be disposed of summarily. Number six asserts that the complaint should be dismissed in its entirety, as plaintiff has failed to allege any facts or assert any legal basis upon which relief can be granted. This is an improper special defense, and it is contradictory to the findings this court sets forth below. Number seven of the Papageorge special defenses asserts that Kalami Corporation was dissolved and therefore no legal claims may be asserted against it. Whether true or not, this pleading is one Ms. Papageorge, who is not an attorney, is not permitted to make on behalf of this corporation. As indicated above, the court views the corporation as playing no role in this trial. The remaining special defenses will be discussed more fully momentarily.

## B

### Papageorge Claims

In the 2014 action, Mary Papageorge filed on her own behalf claims for breach of contract, fraud, unjust enrichment, and abuse of process against Ms. Micek-Holt both individually and as a representative of her father's estate. Both George and Angelina join her in asserting additional claims for intentional and negligent infliction of emotional distress. The relief she seeks is an order that the estate convey title to 361 Thompson Road to her without further payment by her, and dam-

ages of $2,500,000.

In the 2015 action, Ms. Papageorge is the sole plaintiff, in six counts which are essentially restatements of the material just described.[1] In each count she sues Ms. Micek-Holt in each of her two capacities. She seeks, again, a conveyance of clear title, but her demand for damages has risen to $5,500,000.

Ms. Micek-Holt, individually and in her representative capacity, denies all claims. In addition, she sets forth a series of special defenses, including unclean hands, fraud, waiver, reliance upon advice of counsel, failure to meet statutory limits for making these claims, a defense relating to her status as a defendant, and to any claims on the lease, as the lessee, Kalami Corporation, has been dissolved with no apparent successor to its interests.

## II

## STIPULATED FACTS

The parties stipulated to the following facts:

1. On August 15, 2010, Edward W. Micek was the owner of property known as 361 Thompson Road, Thompson, Connecticut.

2. On that date, he entered into a written lease with Kalami Corporation for the use and occupancy of 361 Thompson Road, Thompson, CT. The lease term was from August 1, 2010, to September 1, 2011. The lease provided that the Papageorges and their two children would occupy the property.

3. Simultaneously with that lease, he entered into a purchase and sale agreement for that property with Mary Papageorge. The agreement called for a closing on August 31, 2011.

4. Such closing never occurred.

5. Micek filed a summary process action, which resulted in an April 15, 2013 judgment by the Honorable Leeland J. Cole-Chu.

They stipulated also that they have been unable to agree upon the extent of the res judicata and, or, collateral estoppel effect of that decision.

## III

## ISSUES DECIDED IN FIRST SUMMARY PROCESS CASE

## A

## Findings and Orders of the Court

This court has carefully scrutinized Judge Cole-Chu's decision. It followed a trial of several days duration in January of 2013, and it makes apparent that the parties had the opportunity to air all of the grievances they held against each other at that time.

The court found that Kalami Corporation had fulfilled

all of its obligations as tenant (or sublessor) under the one year lease. Also, it found that Mary Papageorge had been ready, able and willing to consummate the real estate closing on September 1, 2011.[2] What had impeded closing was an argument as to the amount of cash which the buyer would have to pay. The contract stated the purchase price to be $250,000, and provided that it would be paid in the form of three deposits totaling $20,000 plus a note from buyers to seller for $229,000, with the note to be secured by a mortgage upon the subject premises. The $1000 discrepancy between the express purchase price and the payment schedule is in the original. In the 2013 trial, the parties differed as to how much the deposits actually totaled, and what credits and offsets buyer was entitled to in consideration of work done upon the premises. Judge Cole-Chu resolved their disputes as well as the addition error by crediting buyer with effective down payments exceeding $21,000, thus recognizing $229,000 as the proper amount remaining to be paid by the note. Given that finding, he ruled that aside from normal and customary closing adjustments, the buyer had to bring no additional cash to the closing.

Additionally, he heard and adjudicated their claims as to the amount and value of the buyer's preclosing work. His decision refers specifically to her having remediated mold, replaced a water heater, sanded and varnished parts of the flooring, and removed approximately seven trees. He made no separate calculation of any offset attributable to this work. In that case, as in this one, she produced no evidence of the cost of any of that work. Also, the work could be viewed as an aspect of the purchase and sale agreement, which provided that the premises were to be conveyed as is, with any improvements the duty of the buyer.

Beyond calculating the appropriate remainder of the purchase price, the decision also resolves an issue relating to Ms. Papageorge's status with respect to the subject property. Edward Micek had described her and the rest of her family as tenants. Instead, the court held, Ms. Papageorge became the equitable owner of the property when she entered into the purchase and sale agreement in August of 2010. This holding was consistent with precedent summarized just recently in *Southport Congregational Church-United Church of Christ* v. *Hadley*, 320 Conn. 103, 128 A.3d 478 (2016): "[e]quitable conversion is a settled principle under which a contract for the sale of land vests equitable title in the [buyer]. . . . Under the doctrine of equitable conversion . . . the purchaser of land under an executory contract is regarded as the owner, subject to the vendor's lien for the unpaid purchase price, and the vendor holds the legal title in trust for the purchaser. . . . The vendor's interest thereafter in equity is in the unpaid purchase price, and is treated as personalty . . . while the purchaser's interest is in the land and is treated as realty."

(Citation omitted; internal quotation marks omitted.) Id., 111.

Neither party filed any appeal of that judgment.

B

Impact of that Decision upon Present Cases

Ms. Papageorge pleads res judicata as a special defense applicable to Ms. Micek-Holt's counts sounding in breach of contract and for possession of the property. Via a pretrial motion in limine as well as in a motion for summary judgment[3] filed two days before trial, she claimed that the 2013 decision served to collaterally estop the estate from raising these issues in the present cases.

Collateral estoppel is the appropriate concept by which to measure the parties' present dispute over the construction of the lease and purchase and sale agreement, and the precise amount of the purchase price. "The common-law doctrine of collateral estoppel, or issue preclusion, embodies a judicial policy in favor of judicial economy, the stability of former judgments and finality. . . . Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim. . . . For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment." (Internal quotation marks omitted.) *Lighthouse Landings, Inc.* v. *Connecticut Light & Power Co.*, 300 Conn. 325, 343–44, 15 A.3d 601 (2011).

Res judicata, in contrast, precludes the litigation in later actions of claims which existed at the time of a prior action but which were not raised therein. "Generally, for res judicata to apply, four elements must be met: (1) the judgment must have been rendered on the merits by a court of competent jurisdiction; (2) the parties to the prior and subsequent actions must be the same or in privity; (3) there must have been an adequate opportunity to litigate the matter fully; and (4) the same underlying claim must be at issue. . . . Public policy supports the principle that a party should not be allowed to relitigate a matter which it already has had an opportunity to litigate." (Citations omitted; internal quotation marks omitted.) *Wheeler* v. *Beachcroft, LLC,* 320 Conn. 146, 156–57, 129 A.3d 677 (2016).

Applying those measures, this court determines that the 2013 judgment squarely answered all of the parties' questions on lease construction and the enforceability of the purchase and sale agreement, and collateral estoppel thus precludes the parties from litigating those issues a second time in this case. Therefore, the court accepts that the equitable owner of the real estate is

Ms. Papageorge, subject to her obligation to pay the remainder of the purchase price. Likewise, the court will give no weight to Ms. Papageorge's references (sketchy as they were) to the lease-term troubles she incurred with tree removal, or floor repair or replacement, or installing a new water heater, or mold remediation. Judge Cole-Chu decided them unambiguously.

The decision obviously contemplated further performance on the part of each side as to details which remained executory at that time; these included delivery of a deed transferring title and payment in the form of the note and mortgage. Judge Cole-Chu could not have anticipated whether the parties' performance of those details would provide any additional circumstances amounting to a breach subsequent to April 15, 2013, and so the third prong of the *Wheeler* test cannot be found to have been met as to events following his decision. In *Weiss* v. *Weiss*, 297 Conn. 446, 998 A.2d 766 (2010), the court indicated that whether an action involves the same claim as a prior action such that it triggers the doctrine of res judicata requires a transactional analysis. A court must determine pragmatically whether a connected series of transactions form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. Events which occur after a decision is rendered cannot easily be immunized from scrutiny by a later court.

Thus, neither collateral estoppel nor res judicata bar Ms. Micek-Holt from seeking a ruling on the actions taken or avoided by Ms. Papageorge to complete the contract's provisions after April 15, 2013. In so ruling, the court is also rejecting the conclusory allegations of the first special defense filed by Ms. Papageorge claiming res judicata, and the conclusory allegations of her fourth special defense alleging collateral estoppel, except to the limited extent set forth in this memorandum.

Ms. Papageorge's counterclaims in the present cases themselves raise a question of preclusion. Her breach of contract count, in particular, is heavily dependent upon proof of circumstances which took place in August and September of 2011 and their consequences to her. She frames that count so as to include both contract and tort elements. As to the tort elements, at least, they could not have been litigated in the summary process action. As stated in *Pollansky* v. *Pollansky*, 162 Conn. App. 635, 133 A.3d 167 (2016), "[s]ummary process proceedings are limited to a determination of who is entitled to possession of real property. . . . The plaintiff is correct that counterclaims for money damages are not permitted . . . ." (Citations omitted.) Id., 658.

Additionally, she charges Ms. Micek-Holt and the estate with fraud. "[F]raud is an exception to res judi-

cata"; *Weiss* v. *Weiss*, supra, 297 Conn. 459; and thus her fraud count cannot be deemed precluded by the 2013 decision.

Finally, her counts alleging both intentional and negligent infliction of emotional distress arise from events which occurred after the decision. Like the postdecision breach of contract claims, they cannot be said to have been decided by Judge Cole-Chu. Accordingly, this court will evaluate her claims on these causes of action on their merits.

C

What Was Supposed to Happen After April 15, 2013?

The 2013 decision neither rewrote the parties' agreement nor directed how and when a closing should take place, but it was issued with a clear implication that Edward Micek, then still living, had an obligation to convey title by deed to Ms. Papageorge. Reciprocally, it indicated she was obliged to sign a note in the amount of $229,000, secured by a mortgage in his favor. The court left it to the parties to work out the time and place of a closing and resolve what it viewed as the ministerial duties attendant upon transferring title to a parcel of real estate.

IV

WHAT ACTUALLY HAPPENED FOLLOWING
APRIL 15, 2013

A

2013 Closing Preparation

On May 13, 2013, Attorney Nicholas Longo, representing Mr. Micek, wrote to Ms. Papageorge, inquiring who her attorney was and attempting to arrange a closing. On May 20, he transmitted a draft note to her attorney, and on May 23, sent to her a draft deed, mortgage, and note. The tenor of his letters was civil and professional.

Ms. Papageorge's first written reply is an e-mail dated May 29, in which she indicated that the documents appeared to be in order. She went on, however, to demand (1) a doctor's letter stating that Edward Micek was competent to close; (2) interest of almost a thousand dollars on the money paid as a deposit under the purchase and sale agreement; (3) damages for trees brought down by Hurricane Katrina (sic); (4) and unspecified compensation for landscaping and painting she claimed was owed to her as a result of undocumented verbal understandings reached with Mr. Micek or Ms. Micek-Holt.

On June 4, Attorney Longo communicated that the demands were unacceptable, but that his client was still ready to close. He repeated that message on June 18, obviously not having heard from her in the interim. By e-mail on June 21 she stated that "I want everything" denoted in her earlier e-mail, and added new items to

that list. First, she refused to be responsible for taxes on the grand list of October 1, 2012, as the documents specified, as she claimed that language exposed her to payment of "back taxes" owed by Mr. Micek. Secondly, she expanded upon the demand for the seller to complete landscaping work on the property. She concluded by saying that she would not hire an attorney[4] until her demands were met, that the seller was stalling and game-playing, and that she had no doubt that she would succeed if either party took this case back to court.

No closing occurred in 2013.

## B

### Second Summary Process Claim

In the middle of July of 2013, the parties' dispute escalated. Observing activity at 361, which he believed violated the spirit and terms of their agreement, Edward Micek demanded to be allowed to inspect the property. Almost simultaneously, the town of Thompson sent him a cease and desist order demanding that he put an end to allegedly illegal auto sales at 361 Thompson Road. While he was the addressee because title to that parcel remained in his name in the land records, he believed that any illegal activity was the doing of the Papageorges.

Ms. Papageorge's quick reply was to refuse him access and threaten that she would call the state police if he or anyone representing him set foot on her property.

Edward Micek died on March 11, 2014. For reasons as to which one may only speculate, he had filed a second summary process action in geographical area number eleven of this court in December of 2013. That case was pending at the time of his death and was ultimately dismissed as dormant. The court held no meaningful proceedings in that case.

## C

### 2014 Closing Preparation

Ms. Micek-Holt was appointed executrix of his estate shortly following her father's death.

On April 17, 2014, Attorney Harold Cummings wrote to Ms. Papageorge, identifying himself as the estate's attorney and proposing that a closing be held on May 15. On April 30, he wrote to her again, including copies of a proposed deed, note, and mortgage, and inquiring who her attorney would be. In these and in all other written communications with her, the tenor of his writings was civil and professional.

Ms. Papageorge rejected these documents, and indicated that she would not be hiring an attorney until the documents conformed to her demands, and until the estate had agreed to compensate her for the items listed in her earlier communications with Attorney Longo.

She complained that the instruments submitted now recited that she would be responsible for taxes on the grand list of October 1, 2013, which, again, she rejected as being the responsibility of the estate. She quibbled about the credits she believed the Cole-Chu decision entitled her to. In a telephone conversation memorialized in his e-mail to her of April 30, it appears that she had also objected to the deed's recital of $250,000 as the purchase price, contending that she only owed at most $229,000, minus adjustments she believed she was entitled to.

Over the next several weeks, Attorney Cummings attempted to address her complaints about the documents and requested copies of invoices for any work she had commissioned on the property without conceding liability for those items. Ultimately, Attorney Cummings informed her that he and Ms. Micek-Holt would be present at the Thompson town hall on June 30, 2014, to complete the closing.

She did not attend. Shortly thereafter, Ms. Micek-Holt filed the 2014 case.

### D

### Conclusions as to Breach of Contract

After the 2011 breach of contract by Edward Micek, Ms. Papageorge has remained in possession of 361 Thompson Road. With the exception of some homeowner's insurance paid recently, she has paid nothing to Mr. Micek or his estate.

In her response both to Attorney Longo and to Attorney Cummings, she has overplayed the hand Judge Cole-Chu dealt her in his decision. His decision did not leave her the option of attaching a bill for additional claims relating to the physical condition of the property. His decision did not even by implication suggest that she was entitled to interest on the deposits paid to the seller. The decision indicated that she was obligated to sign a note for $229,000, without further discounts or further ado.

Nor did the decision empower her to ignore Connecticut law and local closing customs while serving as her own attorney in preparing for a closing. Our law, for instance in chapter 223 of the General Statutes, imposes a conveyance tax on the sale of real estate calculated on the full purchase price without regard to the timing of payments between the parties. Thus the deed's recital of a $250,000 price was entirely correct and proper.

Similarly, the closing customs of the Windham County Bar Association provide that real estate tax adjustments at closing operate on the premise that "taxes assessed upon the List of the preceding October 1st shall be considered to be applicable to the following fiscal year." It is the rule applicable to all real property in this state that a property owner pays taxes assessed

on one year's grand list in two installments in the following fiscal year, one due in July nine months after the grand list is published, and the second in January of the succeeding year. The county customs[5] provide that closing attorneys adjust taxes to the date upon which the closing occurs. Thus, at a closing held on July 1, for instance, the seller would be liable for payment of all taxes up to June 30, all of which were assessed on the grand list published twenty-one months previously. The buyer would be liable for all taxes due as a result of the assessment made on October 1, of the year preceding the closing, as all of the latter are only prospectively due as of the beginning of the fiscal year. That allocation of the property tax burden is exactly what both Attorneys Longo and Cummings attempted to achieve by including in their draft instruments the reference to the last grand list, as opposed to the next one, as Ms. Papageorge insisted.

Ms. Papageorge's persistence in making demands not allowed by her earlier court victory, together with her stubborn refusal to retain an attorney who might help her overcome her ignorance of standard provisions as to the form of a deed and the propriety of closing adjustments, combine to qualify as objectively unreasonable her claim that it was the estate or Mr. Micek and not she herself who breached the purchase and sale agreement as it stood as of April 15, 2013. This is then the appropriate moment to reject her second and third special defenses, which, under the respective labels of "accord and satisfaction" and "payment," allege in identical terms that she has paid all sums due under the two 2010 agreements. Each is patently false.

Furthermore, these unsubstantiated claims of full payment, together with her resistance for over five years to complete the closing while all along enjoying the benefit of the bargain by remaining in undisturbed possession of the real estate, provide solid support for a finding that she has not shown good faith in this transaction. "Bad faith has been defined in our jurisprudence in various ways. Bad faith in general implies . . . a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . [B]ad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain . . . ." (Internal quotation marks omitted.) *Brennan Associates* v. *OBGYN Specialty Group, P.C.*, 127 Conn. App. 746, 759–60, 15 A.3d 1094, cert. denied, 301 Conn. 917, 21 A.3d 463 (2011).

In light of these findings, the court finds for the plaintiff Micek-Holt on the first count of the 2014 complaint. Her remaining six counts are all derivatives of that count and depend upon the finding that I have reached. Each additional count essentially proposes a different remedy, and each will be examined, below, in the dis-

cussion of the equitable response to the present circumstances which this court should direct.

## V

## PAPAGEORGE TORT CLAIMS

As indicated, Ms. Papageorge and her family have asserted a present total of six claims against the estate and Ms. Micek-Holt, individually.

## A

### Breach of Contract

Ms. Papageorge has an expansive claim for damages flowing from what she believes to be the multiple contract breaches committed by the defendants. As to events occurring after April 15, 2013, this court finds that her own actions and omissions are the source of any distress she may have suffered.

Left to be resolved are her claims that the seller's 2011 breach caused her damages warranting compensation at this time. In her direct testimony, she stated that the earlier breach had ruined her life. What happened, in her words, was a cascading series of calamities, which led to her loss of her business, to adverse civil consequences in the state of Massachusetts, to Bankruptcy Court, and to untold pain and suffering.

Briefly summarized, she testified that she and her husband were in the home heating oil business as they negotiated with Mr. Micek. The business did between four and five million dollars a year in sales, and was subject to the vagaries of weather and international oil prices to an extent unusual for other industries but likely common in this one. Critical to the business' success, she maintained, was the ability to obtain a line of credit secured by the owners' home. By virtue of that, the business could borrow to cover today's purchases until customers sent in their payments. Mr. Micek's default made placement of such a lien upon 361 Thompson Road impossible. No line of credit meant no available cash, meant no ability to continue the oil business, meant bankruptcy and all of its ugly sequelae.

Credibility is always a critical concern in a trial, and unfortunately for Ms. Papageorge, her own husband's testimony contradicted hers on this theory. He testified that the line of credit was only a marginal concern. Instead, he opined, their ability to describe themselves as homeowners would have been the sufficient remedy to their credit problems. As such, they would appear to their creditors to be people of substance who could be trusted for payments a day or a week later to their wholesale suppliers. Additionally, he conceded that the available equity in the property of about $20,000[6] was not adequate to the volume of their cash needs.

Even before her husband spoke, information elicited on cross-examination by Ms. Micek-Holt's counsel pro-

vided additional reason for doubting her direct testimony. In 2012, she was a party to at least three lawsuits brought by business creditors for amounts totaling in the six figures on debts that she had guaranteed for her business. More seriously, the state of Massachusetts had obtained a court order freezing assets belonging to both the Papageorges and their business in that state, and garnishing the business' bank accounts to the extent of some $200,000 for behavior constituting a retail variation on a Ponzi scheme. The company's practice was to accept prepayment from customers in the summer to be applied to deliveries in the fall and winter. When that time came, however, the Papageorges had used the cash to pay other bills. What oil they were able to obtain would be allocated first to new customers on a C.O.D. basis, and the summer customers given fifty or one hundred gallons to silence their complaints until the Papageorges raised enough cash to induce their trade creditors to supply them with more oil—or until the weather improved.

Eventually, enough of those customers complained to the Massachusetts Department of Consumer Affairs that it initiated the proceedings described—prior to August 31, 2011, when the Micek breach occurred. Borrowing against the Thompson property was thus not a component of a sound business plan frustrated by Mr. Micek, but a desperate attempt to borrow from Peter to pay Paul. The Massachusetts proceedings dwarf in magnitude those involved in this action and make absurd her claim that the fiscal house of cards she and her husband had erected before the Micek breach tumbled because they were not in a position to place a junior mortgage on 361 Thompson Road, or to hold themselves out as homeowners.[7]

Those details illustrate why this court is unpersuaded that the Miceks have any liability to Ms. Papageorge for the 2011 breach. That breach was not the cause of her business debacle. Her claim that bankruptcy and other negative consequences were caused by Mr. Micek has no basis in fact or logic. She was likely in deep financial trouble before she moved to Thompson Road and was certainly in such straits before the expected closing date. Moreover, she offered no evidence of damages such a breach might have occasioned, whether that be doctor bills, counseling costs, lost-income projections, or anything upon which to calculate a fair damage award.

On her breach of contract claim, the court finds that she has proven neither liability nor damages to her as a consequence of the 2011 breach, and thus has failed to prove that either Ms. Micek-Holt or the estate is liable to her as a result of that breach.

B

Fraud

After incorporating by reference the ninety-four[8] paragraphs of the breach of contract count, Ms. Papageorge adds that in concealing cash payments prior to August 31, 2011, Ms. Micek-Holt and her father created a false accounting. In what really amounts to a different theory for including this cause of action, she adds an additional charge relating to how they induced her to enter into the "Lease/Contract" in the first place, that is, behavior on their part in August of 2010. She labels all of these actions as fraudulent.

"The essential elements of an action in common law fraud . . . are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. . . . [T]he party to whom the false representation was made [must claim] to have relied on that representation and to have suffered harm as a result of the reliance." (Internal quotation marks omitted.) *Simms* v. *Seaman*, 308 Conn. 523, 548, 69 A.3d 880 (2013). As to the accounting—and even assuming that Judge Cole-Chu's memorandum did not definitively resolve that issue—fraud cannot be found in the details of the Micek deposit reckoning. As soon as the number was presented to Ms. Papageorge she disputed it, and thus cannot establish the prong of this test requiring proof that she acted upon the false representation to her detriment. There's not a shred of evidence to suggest that she believed the Micek accounting for a minute.

With respect to the claim that fraud tainted the 2010 negotiations, it must be noted that her burden of proof is one of clear and convincing evidence. *Reville* v. *Reville*, 312 Conn. 428, 469, 93 A.3d 1076 (2014). Her claim of fraudulent inducement suffers from a distinct lack of pleading specificity; in fact, it is a bald conclusion divorced from any factual allegations which a trier of fact could look to in order to discern whether the elements of fraud had been proven. That pleading defect is perhaps not germane at this time, and potentially curable, but what is not curable is that Ms. Papageorge adduced no evidence indicating that when the parties entered into the various documents in August of 2010 either Mr. Micek or his daughter possessed any intent of doing anything but conveying the property to her in 2011. It's not that her evidence on this point is not clear and convincing, but that, concerning this claim, she has offered no evidence whatsoever.

As to the fraud count in the counterclaim, and its reiteration in the 2015 complaint, the court finds for Ms. Micek-Holt. The court further rejects the fifth Papageorge special defense alleging that the sellers engaged in fraud in their dealings with her.

C

Abuse of Process

The focus of this count is upon Mr. Micek's filing of the second summary process action in December of 2013.

In the recent case of *Rogan* v. *Rungee*, 165 Conn. App. 209, 140 A.3d 979 (2016), the court explained that "[a]n action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed. . . . Because the tort arises out of the accomplishment of a result that could not be achieved by the proper and successful use of process, the Restatement Second (1977) of Torts, § 682, emphasizes that the gravamen of the action for abuse of process is the use of a legal process . . . against another primarily to accomplish a purpose for which it is not designed . . . ." (Internal quotation marks omitted.) Id., 220.

Ms. Papageorge claims there are three respects in which Mr. Micek committed this tort: (1) he filed an eviction knowing of an automatic stay under the Bankruptcy Code entered for her and her husband's benefit; (2) he filed two additional eviction proceedings after Judge Cole-Chu's decision in the 2011 case; and (3) he failed to attach the entire Lease/Contract to his pleadings.

If one, for the sake of argument, accepts all three of these premises as proven and true, one cannot then conclude that his actions amount to the abuse of process. If there was a bankruptcy stay in effect, the remedy would be sought in a contempt proceeding in the Bankruptcy Court. If he filed two additional actions aimed at getting back possession of 361 Thompson Road, he availed himself of a statutory proceeding ostensibly designed for that very purpose. Finally, his omission of the cited documents could easily be cured by a request to revise the complaint, or by the defendant therein producing them on her own behalf.

This imaginative exercise is unnecessary, however, because in spite of participating in a two day trial in which the court afforded her sufficient latitude to prove her case, she offered no evidence on the timing of her (apparently multiple) bankruptcy filings and whether any stay was in effect during the three month pendency of the second summary process case. Nor did she offer any evidence of a third summary process case (which might explain her claim that Mr. Micek filed *two* cases after April 15, 2013); the only evidence presented is that he only brought one such action. Finally, the omission of the attachments to the complaint he filed is a defect of form only. His complaint, which she presented as an exhibit, makes frequent reference to the earlier lease and the purchase and sale agreement, as well as to Judge Cole-Chu's earlier decision. Its omissions, if any,

do not transmute it into a means by which he sought to deceive the court or achieve any improper end.

On the counts claiming abuse of process, the court finds for Ms. Micek-Holt and the estate.

## D

### Unjust Enrichment

Ms. Papageorge claims that the Miceks' retention of deposit moneys and their acceptance of the substantial repairs and improvements made to 361 Thompson Road have unjustly enriched them.

"Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Internal quotation marks omitted.) *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 573, 898 A.2d 178 (2006). That enumeration of the elements of this tort follows immediately upon the court's discussion of the nature of the doctrine and the criteria by which a court might determine if it has been correctly raised. "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy." (Internal quotation marks omitted.) Id., 573.

It is a remedy reserved for those who have acted with equity themselves.

At no time since April 15, 2013, have Ms. Micek-Holt or her father attempted to retain the moneys Ms. Papageorge tendered as deposit payments. Both in 2013 and in 2014, their efforts to comply with Judge Cole-Chu's expectations included giving her full credit for the total $21,000 he found that she had deposited.

How the repairs and improvements inure to the sellers' benefit is unclear. If Ms. Papageorge had completed her performance under the contract, those improvements would be a part of her own home. On the other hand, if by default she put herself in a position of being dispossessed of the property, she can have no expectation that she is entitled to compensation for work she did on the property in the more than five years of her posttenancy occupation.

It should be noted, moreover, that she offered no evidence as to what work was done, when and by whom, what it cost, etc. Thus, even if she had a valid claim

against her defendants on this count, she has inadequately proven any damages flowing from their breach.

As to the counts alleging unjust enrichment, the court finds for Ms. Micek-Holt and the estate.

## E

### Infliction of Emotional Distress

To succeed in a claim for intentional infliction of emotional distress, "four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.) *Watts* v. *Chittenden*, 301 Conn. 575, 586, 22 A.3d 1214 (2011). To prevail on a claim of negligent infliction of emotional distress, "the plaintiff must prove: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." (Internal quotation marks omitted.) *Grasso* v. *Connecticut Hospice, Inc.*, 138 Conn. App. 759, 771, 54 A.3d 221 (2012).

The specific acts cited by Ms. Papageorge in support of these claims are that Ms. Micek-Holt on more than one occasion took photographs of 361 Thompson Road, from a vantage point on a neighbor's property; on another occasion, she told a Papageorge visitor that her hostess was paying no rent; and that at another time Ms. Micek-Holt had "given her the finger." Clearly, none of these acts alone or in tandem amount to extreme or outrageous conduct as our case law defines that term. In *Petyan* v. *Ellis*, 200 Conn. 243, 510 A.2d 1337 (1986), such conduct was described as "conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." (Emphasis omitted; internal quotation marks omitted.) Id., 254 n.5. In *Appleton* v. *Board of Education*, 254 Conn. 205, 757 A.2d 1059 (2000), the court determined that "[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Internal quotation marks omitted.) Id., 211. On the intentional infliction count, the Papageorges' claim must fail.

While the articulation of the elements of an action for negligent infliction of emotional distress does not employ the adjectives "extreme" or "outrageous," the

requirement that any emotional distress complained of must be "severe enough that it might result in illness or bodily harm" establishes a standard against which the scope of this tort might be measured. One is hard-pressed to conceive that people as sophisticated in the rough-and-tumble of the oil business as were the Papageorges would suffer illness or bodily harm as a result of Ms. Micek-Holt's minor incivilities. If their daughter, Angelina, who is reported to now be twenty-one years of age, has her own injuries resulting from these encounters, it was incumbent upon her to appear at the trial to supply some evidence upon which the court could evaluate her claims.

On the negligent infliction count, too, the Papageorges' claim must fail.

## VI

## CONTEMPT ISSUES

In the course of the progress of these cases before the Superior Court, orders have been entered, which, in turn, have prompted contempt proceedings. As trial commenced, the parties remain divided as to the resolution of these issues.

### A

### Rental Payment Order

At a short calendar on November 2, 2015, I heard a "motion for escrow" filed by Ms. Micek-Holt. The motion claimed that the parties had previously agreed upon monthly rental of $1600, that Ms. Papageorge was not making those payments, and that the underlying suit involved their lease and ancillary matters. The motion sought an order that she make payments each month in that amount to be paid into court and held in escrow pending final judgment. I granted that motion.

### B

### Tax Payment Order

At a subsequent short calendar on June 27, 2016, Ms. Micek-Holt presented to the court a motion for an order that Ms. Papageorge make tax payments stemming from ownership of 361 Thompson Road. The court (*Calmar, J.*), granted that motion and ordered her to refund to Ms. Micek-Holt taxes which she had paid to the town of Thompson to forestall a foreclosure of tax liens upon the property.

### C

### Motion for Contempt

On the short calendar of July 18, the court (*Riley, J.*) heard Ms. Micek-Holt's motion seeking a finding that Ms. Papageorge was in contempt for failure to abide by the prior orders described above. Judge Riley granted that motion, found that the total of unpaid taxes was then $16,201.50, and ordered that Ms. Papageorge

pay that amount within thirty days, plus attorney fees of $1200.

## D

### Papageorge Response

After counsel appeared herein for Ms. Papageorge on August 12, he moved to vacate the November 2 and June 27 orders, as well as Judge Riley's contempt finding of July 18, on due process grounds. Judge Calmar denied that motion on September 14. Ms. Papageorge has not represented that she has paid the $17,401.50 ordered by Judge Riley.

## E

### Disposition

Ms. Micek-Holt requests that this court refer Ms. Papageorge to the state's attorney's office to be prosecuted for her continued contempt of court orders.

First, this court will vacate its own order of November 2. Part of the argument made at that time was that the monthly payment was needed to allow the estate to cover taxes on the property. The motion Judge Calmar granted on June 27 dealt with taxes, and there is therefore redundancy between the two orders in an unknown amount. The value of the use and occupancy of the premises throughout this litigation is something I have taken into account in the final orders entered today, and thus the earlier, interlocutory order is unnecessary as well as confusing.

The tax payment order, however, was authorized and equitable, and it remains ignored. The final orders entered today will direct that this be paid, an order that Ms. Papageorge may satisfy. If she fails to do so, Ms. Micek-Holt may pursue any remedies available to her. If that includes a civil sanction for contempt of the court's pendente lite orders, Ms. Papageorge will have to answer when she is summoned to court. The dispute, however, is civil, not criminal, and this court therefore declines to refer the matter to the state's attorney's office for prosecution as requested.

## VII

### CONCLUSION AND ORDERS

"[T]he determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court." (Internal quotation marks omitted.) *Independence One Mortgage Corp.* v. *Katsaros*, 43 Conn. App. 71, 75–76, 681 A.2d 1005 (1996). In the exercise of that discretion, "[in] an equitable proceeding, the trial court may consider all relevant circumstances to ensure that complete justice is done." (Internal quotation marks omitted.) Id., 75. The court indicated in *Home Owners' Loan Corp.* v. *Sears, Roebuck & Co.*, 123 Conn. 232, 242, 193 A. 769 (1937), that an equitable result "depends to a large extent upon the

circumstances of the particular case."

The particular circumstances of this case are sufficiently involved as to make the court's task somewhat more difficult than usual. Each side accuses the other of unclean hands. Each is correct. Mr. Micek's abrupt 2011 decision to declare the sales agreement in default needs no further discussion. Ms. Papageorge's prolonged refusal to compensate the estate for the real property she occupies, or to satisfy Ms. Micek-Holt's reasonable demand that she be repaid for the taxes she paid, eclipses the wrong done to her in 2011.

The court is mindful of the maxims "equity abhors a forfeiture," and "equity views as done that which ought to have been done." The first conduces toward an award leaving Ms. Papageorge in ownership of the real estate, as she had made deposit payments and done some work upon the property before becoming the initial victim in this long-running saga. In the orders entered below, functionally, the court is averting a forfeiture by granting the relief requested in the sixth count of the Micek-Holt complaint where she demands an order of specific performance of the original purchase and sale agreement.

At the same time, Ms. Papageorge's indifference to the obligations of that bargain over more than three years cannot go unrecognized and cannot be allowed to persist. The second equitable maxim cited authorizes orders that require her to make good upon her multiple failures to hold up her end of that bargain dating back to June of 2013. Ms. Papageorge has shown this court no valid reason why the closing did not occur in that month, nor presented the court with any valid reason for discounting the payments she agreed to make and ought to have made since then. Without revising the terms upon which the parties agreed in 2010, the court will apply the provisions of that agreement with adjustments for the passage of time and the performance or lack thereof by the parties in the interim.

In calibrating the extent of the performance Ms. Papageorge must make up at this time, the court has utilized June 24, 2013, as the date upon which the closing ordered by Judge Cole-Chu ought to have taken place. The note upon whose terms the parties agreed provided that interest of 4.85 percent would be added to a principal of $229,000, and amortized via monthly payments of $1208.41, augmented by three annual principal reduction payments of $10,000 each. If the closing had occurred in June of 2013, and Ms. Papageorge complied with the contract terms, she would by October 24, 2016, have made forty monthly payments of $1208.41, plus $30,000 in the annual payments, for a total of $78,336.40. She must make that payment now to preserve the opportunity to retain ownership of the property.

The present payment of $78,336.40 would reduce the

amount remaining to be paid in coming years, as it includes a substantial reduction of the principal amount of her debt to the estate. The note promising to pay the balance due will thus no longer be in the amount of $229,000, as it must be adjusted downward to account for the portion of that amount representing payment on the principal.[9]

Additionally, with ownership came the responsibility to pay the taxes upon the tract. Ms. Micek-Holt's second count claims damages for unjust enrichment. She has proven that she incurred expenses amounting to $17,401.50 for tax payments required to save 361 Thompson Road from foreclosure, including attorney fees. Those tax payments were the legal liability of Ms. Papageorge. She cannot claim the benefits of that status unless she acknowledges the responsibilities that flow from it. The court finds for Ms. Micek-Holt, individually, on that count, and orders that Ms. Papageorge reimburse her without further delay.

This judgment disallows any further Papageorge demands for discounts relating to work she has done on the property. Those items were covered by Judge Cole-Chu's decision. Furthermore, she provided this court with no evidence upon which to determine the true value of her demands in that regard.

Because this court is concerned that Ms. Papageorge lacks either the will or the ability to complete this purchase, the court will also provisionally grant Ms. Micek-Holt the relief she requests in her fourth, fifth, and seventh counts. These demand the extinction of any equitable claims Ms. Papageorge may have to 361 Thompson Road, an order quieting title to that parcel in favor of the estate, and the eviction of the Papageorges from the property. In the event that Ms. Papageorge fails to complete the closing as hereafter ordered, this judgment contains orders responsive to that eventuality.

Lastly, the court considers that Ms. Papageorge does owe the estate use and occupancy payments if she fails to pay the amounts owed on the note as indicated above. The original lease allocated one thousand dollars per month to the value of the property, and six hundred to tax and insurance costs. This decision has treated the tax issue separately, as indicated, and thus adopts one thousand as the reasonable value for use of the premises since June 24, 2013. Note, this element of the judgment is only reached in the event that Ms. Papageorge fails to pay the accrued principal and interest payments described.

Time is of the essence as to the performance of these orders.

In light of the foregoing it is, therefore, ORDERED:

1. Judgment on all counts of the complaint in CV-15-5006173-S shall enter in favor of Andrea Micek-Holt in

her individual and representative capacities, and against Mary Papageorge.

2. On the counterclaim in CV-14-6008881-S, judgment on all counts shall enter in favor of Andrea Micek-Holt, and against Mary Papageorge.

3. On the complaint in CV-14-6008881-S, judgment on the first count shall enter in favor of the plaintiff.

4. At a time and place of the parties' choosing up to October 24, but, absent agreement, then at the Thompson Town Hall at 2 p.m. on October 24, 2016, the parties will meet for the following purposes:

(a) Andrea Micek-Holt will convey to Mary Papageorge all the right, title and interest held by the estate of Edward Micek (seller) in and to premises known as 361 Thompson Road in Thompson, more fully described in the Executor's Deed submitted to this court as plaintiff's exhibit 1, to which reference may be had. The deed shall be in the form prepared by Harold Cummings, Esq., and attached to plaintiff's exhibit 32. The date of the grand list referred to therein shall be October 1, 2015.

(b) Seller shall be responsible for payment of its own attorney fees, and for the town and state conveyance taxes required by statute.

(c) In consideration therefor, Mary Papageorge (buyer) shall:

(i) Deliver to seller by bank or cashier's check the amount of $78,336.40;

(ii) Execute and deliver to seller a promissory note in the principal amount of $229,000, less that portion of the sum set forth in the preceding subparagraph, which represents payments of principal on the note between June 24, 2013, and October 24, 2016, had the note been signed on the 2013 date. Prospectively, interest on the note shall be paid at the rate of 4.85 percent per annum. Monthly payments on the note shall commence on November 24, 2016, in the amount of $1208.41 each, until the debt memorialized thereby has been fully amortized;

(iii) As security for that note, buyer shall execute and deliver to seller a first mortgage encumbering the 361 Thompson Road property, and shall provide a release for any encumbrances placed upon her interest in the property on or after August 1, 2010;

(iv) Buyer shall be liable for the cost of recording the deed and the mortgage, and for her own attorney's fees, including title insurance, if required;

(v) Buyer shall also provide the seller with proof of insurance upon the premises, naming the seller as an additional protected party, in an amount at least equal to the amount of the note, and such insurance shall be kept in effect until the note is paid in full.

(d) There will be no adjustments or demands for adjustments relating to the condition of the premises now or at any earlier time, nor for repairs done to it by either party.

(e) No tax adjustment shall be owed to buyer for any period following June 24, 2013.

(f) Not later than the conclusion of that closing, buyer shall reimburse Andrea Micek-Holt personally for taxes she paid to the town, and attorney fees previously ordered in this action, in the amount of $17,401.50.

(g) Pending that closing, plaintiff shall not go upon that property, except by invitation of defendant or in the event of true emergency.

(h) Under no circumstances shall buyer, or George Papageorge, or any agent of theirs, including, but not limited to, other family members, cause any damage to the premises by intent or negligence, including omission of necessary maintenance of the property, prior to the closing, or, if they fail to close, at any time following the entry of this judgment.

5. By 5 p.m. on October 26, 2016, counsel for the parties shall file affidavits with the clerk of this court attesting that the closing ordered by paragraph 4 has occurred, and all of the terms set forth in that paragraph have been fulfilled. Upon the receipt of those affidavits, the clerk shall indicate on the file that the judgment in this matter has been satisfied, and the orders numbered 6 and 7, below, shall be vacated.

6. In the absence of the filing of such affidavits:

(a) Mary Papageorge, George Papageorge, and Angelina Papageorge are ordered to vacate 361 Thompson Road not later than 5 p.m. on October 26, 2016, together with all their possessions, and along with any other persons whom they might have permitted to occupy said premises. In the event that they hold over after that date, they shall make use and occupancy payments to the estate at the rate of $150 per day. The clerk of this court may issue an execution of eviction order if requested by plaintiff at any time after October 26;

(b) The interests of Mary Papageorge in the property located at 361 Thompson Road, Thompson, Connecticut, whether arising from lease, contract, or whatever source, are hereby extinguished;

(c) The clerk shall issue a judgment file quieting title to the premises in favor of the estate of Edward Micek;

(d) Judgment shall enter in favor of the estate against Mary Papageorge in the amount of $40,000, on the second count of the complaint.

7. Judgment enters in favor of Andrea Micek-Holt against Mary Papageorge in the amount of $17,401.50.

8. No costs are taxed to either party.

* Affirmed. *Micek-Holt* v. *Papageorge*, 180 Conn. App. 540,      A.3d (2018).

[1] Her complaint has a seventh count captioned, "Misconduct." At trial, her counsel withdrew this count.

[2] Testimony in this case indicates that Hurricane Irene had buffeted Connecticut on August 29, 2011, and that as of September 1 all of Thompson Road was without power and the site of numerous downed trees. Accordingly, a closing on the first would have likely been impossible. However, time was not of the essence of the agreement, and the marginal delay caused by this weather event was not the cause of the parties' dispute; the storm did, however, drop trees at 361 Thompson Road, and the cost of their removal did become a sticking point.

[3] These filings came to the attention of this court at a trial management conference held just prior to the trial. The court denied the motion in limine as the full import of the 2013 decision was unclear in light of subsequent events. Ms. Papageorge accompanied her motion for summary judgment with a request for leave to file, which this court denied; proceedings on that motion likely would have delayed a resolution of the parties' claims for several additional months, an unacceptable delay in a case of this nature, which has already passed its fifth anniversary. However, the court indicated that it was not deciding the merits of either motion.

[4] Note that on May 20 Attorney Longo had communicated with an attorney he believed was representing her; she appears, instead, to have continued to represent herself, at least in a cocounsel arrangement.

[5] This court is unaware of any local custom in any other region of the state which would direct a result different from that outlined herein.

[6] I.e., sale price of $250,000 minus mortgage of $229,000, rounded down. It must be noted that whatever equity inhered in the property, there was no evidence that any bank's post–2008 loan standards would permit a loan to the Papageorges given the credit problems they obviously were afflicted by.

[7] Additionally, in approximately March of 2012, Mr. Papageorge lost title through a foreclosure proceeding to real estate in Massachusetts which he or his family had owned for half a century. Thus, he was, prior to that date, already a homeowner.

[8] There are ninety-four paragraphs in the breach of contract count as Ms. Papageorge expressed the same in her counterclaim to Ms. Micek-Holt's 2014 action. By the time of her own 2015 complaint, her expression of that count had grown to one hundred and twenty-one paragraphs. The observations as to the substance of the fraud count are accurate as to both of these pleadings.

[9] The court has not calculated the exact principal balance that would therefore be due. It is not so simple as subtracting $78,336.40 from $229,000, as the payments are a combination of both principal and interest and only the amount of each payment attributable to principal reduces the note amount. The parties must prepare an amortization table to show the amount of the principal remaining due on October 24, 2016; that is the appropriate amount of the note that Ms. Papageorge must sign and deliver.